The original bill, filed 11 September, 1829, by Falls, charged the contract of November, 1826, and that he was in possession under it, and made payments which satisfied the small bond, and left the sum of one hundred and thirty-one dollars, besides interest, applicable to one of the bonds for three hundred and seventy-five dollars; and that in August, 1829, while the contract was in full force, a valuable gold mine was discovered on the land, which he and other persons under him began to work; that the defendants, Birchett and Ormond were on the land, and saw the plaintiff and his tenants collecting gold, and knew that he had purchased the land, and then claimed it, and was in actual possession; and that with knowledge of these facts they, on 22 August, 1829, without informing Falls of their purpose, went to Carpenter (who resided seventeen or eighteen miles off), and proposed to purchase the same lands for themselves; that Carpenter refused to sell to them unless with (239) Falls' consent, or unless he could get up his bond to Falls, upon which they represented to him that the bond was not obligatory, because the purchase-money had not been punctually paid, and also that Falls was yet unable to pay it, and wished to rescind his contract, and pretended that they wished to purchase that the one might build a mill and the other set up a store, which he wished to do immediately, as his goods were already purchased; that Carpenter did not wish to keep the land himself but to sell it; and believing those false representations, agreed to sell to them at the price of seven hundred and fifty dollars, which was immediately executed by their giving their bonds for that sum and taking a deed from Carpenter in fee; that during the treaty they concealed from Carpenter the fact that gold had been found on the land, and in answer to an inquiry by him on that point, denied it. The bill further charged that Birchett and Ormond entered into a part of the land and collected some gold, of which an account was prayed, and threatened to bring an action of ejectment or otherwise expel Falls from the land which he had under cultivation or was working for gold. It also charged that between 22 August and the filing of the bill the plaintiff had come to a settlement with Carpenter, and ascertained the balance due on his bonds, and that he had fully paid the same and taken up the bonds. The prayer was for a conveyance by Carpenter, Birchett and Ormond, or those of them in whom the legal title was, and for an injunction and general relief.
Carpenter died intestate, after service of the bill and before answer; and by a bill of revivor and supplemental and amended bill the suit *Page 193 
was revived against his administrators, widow and heirs. And it was further charged that the defendants Birchett and Ormond had sold and conveyed shares of the land to certain other persons who had notice of the plaintiff's rights, and were made defendants; and that Falls, before the filing of the original bill, had also assigned undivided shares to certain persons who were made plaintiffs with him.
The administrators were P. Manney and Frederick Carpenter, (240) the younger, who was a son and one of the heirs of F. Carpenter, deceased. They answered, and admitted the contract of November, 1826; the possession of Falls under it; the payment of grain to the quantity and value charged in the bill; the sale and conveyance to Ormond and Birchett, and the subsequent payment by Falls of the balance due on his bonds, all as charged in the bill; that thereupon the intestate informed Falls that Birchett and Ormond had obtained a conveyance from him by inducing him to believe that Falls was unable to pay for the land, and that the contract with him was void; and offered then to make Falls a deed, which Falls declined accepting unless that to Birchett and Ormond were first surrendered and canceled; that the intestate then sent the bond of Birchett and Ormond to them by one Adderholt as his agent, with instructions to tender it to them and demand the deed, which was done, but they refused. These defendants then submitted to any decree between the other parties, and to repay the plaintiff his money, or to surrender to Birchett and Ormond their bond, as the court might decree the land to belong to the one or to the other.
By an amended answer, the administrators said that they had no personal knowledge of the transaction, and had before answered upon information which they have since discovered to be untrue, and to have been imposed on them by the plaintiff and those interested with him; and they and the other heirs and the widow of Carpenter then stated the contract of February, 1823, and that of November, 1826, and that although some grain was delivered they did not know how much, and believed not more than discharged the note for eighty-three dollars and forty-three and three-quarter cents, or certainly that and the interest on the other bonds, so that the whole principal purchase-money remained due in November, 1828, when the last bond became payable; and that no payment was made thereafter until the last of August, 1829, when Carpenter had sold to Birchett and Ormond. They stated that through the winter of 1828 and in the spring of 1829 Carpenter applied to Falls for payments, and insisted on them; and that Falls was unable, oralleged that he was unable, to make any, and proposed to Carpenterto rescind the contract, which was then agreed to by Carpenter, (241)and the contract considered to be rescinded; that it was thereupon understood between these parties that Carpenter should make *Page 194 
sale of the land for his own benefit, but that he should keep the notes of Falls, and the latter keep possession of the land until a new sale; and when such should take place, that a settlement should be made and the notes and possession mutually surrendered; that, accordingly, Carpenter made several efforts, with the knowledge of Falls, to sell, and could not until August, 1829; that on the 22d of that month Birchett and Ormond and one Robert Dixon, having ascertained that a very valuable gold mine (which has since turned out to be worth, probably, one million of dollars) had been just before discovered on the land, formed the design to purchase it on speculation, and applied to him for that purpose; that Carpenter wished time to consider of it; and that he was an old, weak and intemperate man, at no time well able to attend to business, and then sick in bed; that they represented to him that they were anxious to get the land for the purpose of building a mill and a store, and if they could not get it immediately they would not purchase at all, and both concealed and denied that gold had been found on the place; that thereupon Carpenter contracted with them and conveyed the land to Birchett and Ormond, as charged in the bill; that he was induced to make the contract by the urgency of those persons, in the belief that they really wanted the land for the purposes mentioned by them, and that they hurried him into the completion of it then, before a rumor of the existence of the gold mine could reach his ears or he might have any other reason to suspect their motives.
The answer then stated that, a few days thereafter, Falls and the plaintiff Wilson (who, with others, had formed an association to get a title and work the mines) offered to pay off the notes of Falls, and demanded a deed; that he was confounded at discovering the fraud that had been practiced on him by Birchett and Ormond, and also at the demand of Falls and Wilson, and disclosed to the latter his true situation and embarrassment, and asked Wilson's advice what he (242) should do; that they insisted on Falls' claim, and repeated the tender of the money, and advised him to take it, as that could not make the matter worse for him, and that, intimidated by their menaces and at their suggestion, Carpenter appointed Adderholt, his agent, to take advice and act for him, who attempted to get the contract with Birchett and Ormond rescinded, but failed, and thereupon received from Falls and Wilson, in cash, a part of the sum due on Falls' bond, and took the bond of Wilson for what they admitted to be the residue, but that Carpenter refused to accept from Adderholt either the money or Wilson's bond, or to make a deed to Falls, and, overwhelmed with the perplexities of his condition, soon after died, before he could answer the bill. *Page 195 
The defendants, Birchett, Ormond, and Dixon, answered, and admitted the purchase and conveyance from Carpenter, for which they gave their bonds for $750. They stated that, two or three days before, they had seen persons digging and washing for gold on a piece of land which they were informed and believed was vacant; that Dixon, who lived on an adjoining tract, so believed; that it was, on 22 August, 1829, agreed between the three that they would enter the land they supposed vacant, and as they expected the vein of ore to run also into the Carpenter land, the line of which, as they believed, ran very near the spot at which the gold was found, it was further agreed by them to buy that land also; that Dixon went to the entry-takers to make an entry, in his own name, on the joint account, and Birchett and Ormond proceeded to Carpenter's to make the purchase from him, and did so, taking the deed in their names, also on the joint account. They stated that they knew Falls had agreed for the land, but had understood and believed that he was unable to pay for it, and had before abandoned it, which belief was founded upon the facts that Falls was notoriously an imprudent and insolvent man; that Carpenter had repeatedly offered the land for sale to Ormond and others, from the autumn of 1828 up to that time, declaring that he was absolved from the contract with Falls by his noncompliance, and that, although this was generally known, they (243) never had heard that Falls forbade Carpenter to sell; that they did not use any persuasion to induce Carpenter to sell to them; that they considered him to be the absolute owner, and knew that he was desirous to sell to raise money, and that as soon as they made known their wish Carpenter agreed to make the sale; that the remarks about Falls' claim came from Carpenter, who mentioned that he had a long time before agreed to sell to Falls, but he was no longer bound, and "his bond was dead," because Falls had made no payment and never would be able, and because he (Carpenter) had sent to him, the spring before, to come and settle with him, as he was about to sell the land to other persons, and Falls neither paid anything nor came to see him. They admitted that Birchett and Ormond did not mention to Carpenter that gold had been found, and said that the reason was that they were not then certain that it was on his land, although they expected that it would extend into it. They denied that they made any false representations touching the gold, and stated that Carpenter made no inquiries, but voluntarily said, during the treaty, that he hoped they might find gold in abundance; that Dixon also came to Carpenter's in the evening, when they were writing the deed, and upon being informed by Carpenter of the contract, remarked to him "that he had better take care what he was about — perhaps there's gold on your land"; to which the other replied "that he wished they might find the best mine in the country; *Page 196 
he did not want gold mines, as he was too old to work them, and wanted nothing but the value of his land or the money for his land." The answers then stated that these defendants entered into the lands immediately and began to work the mines, but were in a few days evicted, under color of a summary process, for a forcible entry and detainer, by means of which Falls, Wilson and the other plaintiffs got into exclusive possession; and, further, that on 4 September, 1829, the defendant Ormond had sold and conveyed to the other defendant, Dixon, his third, and that Birchett and Dixon had since associated with themselves the (244) other persons named, who were made defendants by the supplemental bill, who also put in answers, in which nothing material was set forth.
By a subsequent answer, Robert Dixon disclaimed, and the defendants, Birchett Co., exhibited a deed from him to themselves, dated 3 May, 1832, with special warranty for all his share and interest.
Birchett and Ormond instituted an action of ejectment against Falls and others to recover the possession which was thus lost by them, and, the trial of the same being delayed, Birchett and the assignees in May, 1832, filed their cross-bill against Falls and his partners, in which they charged the two contracts between Falls and Carpenter, and that the latter was merely an extension of the time by reason of his inability to pay the purchase money, and sought a discovery as to that fact and as to the particulars of those contracts. The bill also charged that Birchett and Ormond had heard various reports, which were in common circulation, that Falls had wholly failed to comply with his contract and had abandoned it, and that they then became desirous of purchasing from Carpenter, as was generally known, and particularly by Falls; that on 22 August, 1829, or the day before, Birchett and Falls were on the land together, and that the latter, then knowing of the intention of the former to purchase, made no sort of objection thereto, but expressed his satisfaction therewith; that, in fact, Falls had told Carpenter that he could not pay for the land, and directed him to sell to any other person who could pay for it, to whom he (Falls) would surrender all claim, and that Carpenter so declared to them, Birchett and Ormond, at the time that he sold to them. The bill further charged that no person was in actual possession of any portion of the land, but one Arrowood, who attorned to the plaintiffs, and that they entered into the peaceable possession and continued it for a few days, until turned out in the manner stated in their former answer, and that Falls and the other defendants got into possession and were making great profits and committing irreparable waste. The prayer was for a discovery of all the matters charged, for an account of the gold already made, and for an (245) injunction against further waste or working. *Page 197 
All the defendants put in answers, but that of Falls was the only material one in the present state of the case, and none of the others were contradictory of it. That admitted the two contracts of 1823 and 1826, and that the last was substituted for the former at his instance, because it was more convenient to pay in grain than money. He denied that he was unable to pay for the land, and said he could always have done so, if pressed, but that Carpenter promised not to press him; that in the winter of 1826-27 he paid 200 bushels of corn, and in 1828 more corn and rye, amounting, altogether, to $240, and in the spring of 1829 Carpenter applied to him for $25, which he had not by him, and he requested Carpenter to borrow, and he would take up his note, and that he did pay Carpenter's note to John Falls for about $26, which was satisfactory to Carpenter. The answer denied positively any agreement with Carpenter to rescind the contract or any abandonment or any act or omission from which it could be inferred, or that he ever agreed that Carpenter should sell to any other person, and, on the contrary, stated that he was in actual possession of the land, claiming it under his purchase, cultivating and improving it, and digging for gold, both he and his hirelings and tenants, and that Arrowood was one of his tenants and had continued to work under him ever since; that it is true that on 21 August, 1829, both Birchett and Ormond (the former of whom was a stranger to this defendant) were on the premises and saw Falls and his hands collecting ore, and became fully aware of its richness and the great probable value of the mine, and, no doubt, formed the design then of purchasing from Carpenter, and may have thought they would hold the land if they could get his deed, notwithstanding the contract with Falls, as they, after getting the deed, insisted on it as a good title, because it was the first and a warranty deed, and said that Carpenter and Falls might settle the dispute upon their contract between themselves. But the answer denied positively that this defendant assented to or had the least knowledge of their intention to purchase, (246) or even suspected it, until he heard, in the evening of the next day, the 22d, that they had gone to Carpenter's for that purpose. The answer stated that both Birchett and Ormond conversed with this defendant, and neither of them intimated such an intention, but that, on the contrary, Birchett applied to him for a lease, and denied that he subsequently expressed his satisfaction at their purchase, but, so far from it, that upon hearing that such was their business he set off early on Sunday morning, 23 August, to Carpenter's, to put him on his guard and prevent him from making a contract; that upon getting there, he heard for the first time that they had obtained a deed, and was also told by Carpenter of the misrepresentations (as charged in Falls' original bill) made to him by those persons as to gold being on the land, and also *Page 198 
that this defendant was willing to give up his contract and would have come with them and brought up the bond had he not been confined at home by sickness, and that, upon Carpenter's expressing a desire to postpone a contract until he could consult this defendant, who was, as he considered, entitled, Birchett and Ormond assured him that he (Falls) had agreed with them to give up the land and all claim on Carpenter for his improvements, all which representations the answer affirmed to have been false. The answer then stated that, upon hearing the truth from this defendant, Carpenter declared that he had been imposed upon, and that he would never receive the money from Birchett and Ormond, and in a few days sent their bonds to them by his agent, Adderholt, and demanded his deed; that he (Falls) returned to the land and went the next day to work the mine, when he was prevented by Dixon, who claimed it under Carpenter's deed, and that thereupon he associated himself with Wilson and the other defendants, as a copartnership, to receive the title and work the mines; that on the last day of August, Falls and Wilson offered to settle with and pay Carpenter, who expressed a perfect conviction that he had been imposed on respecting Falls' giving up or abandoning the contract, and a readiness on his part to comply with it, but desired time to send to Birchett and (247) Ormond for his deed, which he wished to get up, and that on their refusal he said that he would accept the payment from Falls, and did so, as stated in the bill, on 2 September, 1829, it being then understood that Falls, Wilson and others would file a bill against Carpenter, Birchett, and Ormond to have their deed surrendered or obtain a conveyance. The answer then asserted that Falls was never out of possession of the land, but admitted that Ormond, Birchett, and Dixon were in possession of a part of the gold mine for a few days, until they were evicted, as alleged in the bill. The answer then set forth a statement of the number of hands engaged in the service of the defendants in working the mines, the gold collected, and the mode of working it.
At Fall Term, 1832, the heirs of Carpenter also filed their cross-bill against Falls and those claiming with him, and against Birchett and those claiming with him, to rescind the contract with Falls, and also for a reconveyance from Birchett and Ormond and others, upon the ground, as to the first, that it had been abandoned by Falls not making the payments stipulated, and by reason of his insolvency, being unable to make them, except from the great and sudden increase in the value of the land, and that it had been rescinded by express verbal agreement, and that Carpenter had been surprised into receiving the payment on 2 September, 1829, he heing [being] incapable of business, from age, infirmity, ignorance and weakness, and that, at any rate, as he had not made a *Page 199 
deed to Falls, he ought not to be held obliged to do so, since the value of the lands had accidentally increased so immensely, and as to the latter, for the causes of fraudulent concealment and misrepresentations and hurrying into the bargain and conveyance before set forth in the bill of Falls and others and in the answers of the Carpenters thereto.
To this bill Falls put in an answer substantially the same with that to the cross-bill filed by Birchett and others against him, adding that when he went to Carpenter's in August, 1829, he carried and showed to him one of the best specimens of ore found in the mine, and made a full disclosure of its extent and richness, as far as then (248) discovered, and that Carpenter was dissatisfied only with Birchett and Ormond for their deception practiced on him, but was perfectly satisfied with his conduct, and expressed his willingness to make him the title as far as he could, and that he received the payment on 2 September without the least influence or menace from any person, and voluntarily, because he thought it right that the deed to Birchett and Ormond should be canceled and a conveyance made to Falls, and that he was then in the full enjoyment of his faculties; that the value of the mines was greatly overrated, for that shares of one-tenth part sold several months afterwards at $300, and it was a subsequent discovery that enhanced the value to a large but uncertain amount; that when his bonds fell due, he owned unencumbered land in the county, besides that purchased of Carpenter, worth $2,000, which was known to Carpenter, who neither wished to rescind the contract nor abandon it, nor would have let Falls do so.
Birchett and Ormond also answered this bill to the same effect with their answer to the original bill of Falls and others, admitting, further, that their principal object in buying the land was the prospect of gold, and that the spot where the gold was then found (which they then thought was vacant) was included within the lines of the Carpenter land, which had been sold to him by the party, Robert Dixon, and stating also that that vein turned out to be of little value, but that several months afterwards another of great value was discovered in another part of the land; that Carpenter expressly declared that he and Falls had rescinded their agreement, and that he readily contracted with them and sent for Adderholt, his friend and neighbor and ordinary adviser, to draw the writings, who came and did so, and that before he executed them Dixon arrived and informed him that there was probably gold, to which he replied "he did not care, and hoped there might be; that if there was he did not want it, but wanted money to pay his debts and put his mind at rest"; that he was perfectly competent to do business, and had the assistance of his confidential adviser, (249) Adderholt. *Page 200 
To the answers in each of the causes, replications were entered, and a large mass of testimony taken by all the parties. The most important were the depositions of Adderholt, the person mentioned in the pleadings, which were taken several times by the parties respectively.
That witness stated that he was the friend and near neighbor of Carpenter, with whom he generally advised upon matters of business, and on whom he called to do his writing; that he drew the contracts between Carpenter and Falls, and that he knew that Falls paid corn and rye in 1827 and 1828, though he could not state the precise amount of his own knowledge, and that he also paid a note of Carpenter's to John Falls for twenty-six dollars; that it was agreed the small bond should be first paid, and any surplus should be applied to those given upon the last bargain for the price of the land. He further stated that on 22 August, 1829, Ormond came to his house and stated that he and Birchett had bargained for the land, and that Carpenter had sent for him to draw the bonds and deeds; that he went, and on the way asked Ormond if Falls was there, and he said not; that he then asked if they had the bond to Falls, to which he also replied no, and that they had been to see him, but that he was intoxicated continually. The witness then remarked to him that Falls or the bond ought to be there, and Ormond stated that Birchett was with him the day before but that he was so stupidly drunk they could do nothing with him. The witness asked if they had found gold on the land, and Ormond said not as he knew, and that he and Birchett wanted to set up a mill and store on the land. Upon their arrival at Carpenter's the terms of the bargain seemed to have been settled, but Carpenter asked him what he thought of the trade, and upon his saying that he thought Falls or the bond ought to be there, Carpenter observed that he thought so too. Birchett or Ormond then said there was no danger, for as Falls had not paid his bonds, Carpenter's bond was void. When the deeds were drawn, Carpenter hesitated to sign them, and said he did not like to do so without (250) Falls or the bond; when Dixon, who had then arrived, said that the bond was void and there was no danger. It was understood by all parties that Falls was then in possession, and the witness then heard of no other person who was. After Dixon's remark, Carpenter executed the deeds, and in a little time Birchett or Ormond asked how they were to get possession, to which Carpenter replied, "You must see to that yourselves." Both Birchett and Ormond denied at that time that they knew of any gold on the land; and on that occasion Carpenter said he had no persons to work gold mines, and did not care for them, but he wished they might find one; that what he wanted was his money for the land, which he believed he could never get Falls to pay him; and Birchett or Ormond then said there was no doubt Falls would give *Page 201 
up the land and come to a settlement. The witness stated that Carpenter was a weak man, and not very competent to business from age and intemperance, and was not entirely sober on that day; and upon being asked why, as his friend, he did not postpone the business until the next day, he replied that he had great confidence in Ormond's integrity, and thought everything fair; and he himself became their surety in the bonds to Carpenter for the purchase-money. The witness further stated that he had considered Carpenter's "bond dead" because Falls had not paid, and that he had several times told Carpenter so, but always advised him not to sell to any other person before he took it in; that this opinion was founded on the belief that the bond provided on its face that if Falls did not pay his bond when due, Carpenter should be discharged; but that, upon seeing the bond, he found that he was mistaken. Two or three days afterwards Falls and Wilson came down to pay Carpenter, who again sent for the witness to make a settlement for him. Carpenter complained of being deceived by Birchett and Ormond, and was unwilling to receive the money from Falls until he could get up his deed. They, however, made a statement of the payments before made, which discharged the small bond and a hundred and thirty-one dollars of the purchase money, besides nine or ten dollars allowed as interest for the payments in advance. Carpenter (251) asked Falls to wait until he could send to Birchett and Ormond, which was acceded to; and the witness went with their bond and requested them to give up the deeds, as Carpenter alleged that he had been imposed on and wished to have no difficulty with Falls and Wilson. Ormond was then willing to surrender the deed, but Birchett and Dixon refused. That he returned, and on 2 September the settlement with Falls was completed, and Wilson paid six hundred and thirty-five dollars and sixty-two and a half cents in cash, and offered to pay the residue, but Carpenter requested him to keep it, and give his bond, as he wished to keep that at interest. Carpenter delivered the money to the witness for safe-keeping, but in a few days took two hundred dollars, and afterwards lent the witness on his bond three hundred dollars more, and the residue the witness paid to the administrators after his death. The witness stated that when he went to get the deed from Birchett and Ormond, the latter admitted that the conversations with Carpenter, before Adderholt was sent for, "were or might be sufficient" to make him think they would have brought Falls or the bond, if he had not been too drunk; and Ormond afterwards acknowledged that they told Carpenter that they, Birchett and Ormond, would run all risks about the bond to Falls. Birchett also admitted to him that before he bargained with Carpenter he had tried to get a lease from *Page 202 
Falls, and could not; but Dixon said it was not from Falls but from one Crane who then had a lease from Falls.
It clearly appeared upon other proofs that Falls had been in possession from 1823 up to August, 1829, and that he or his tenants lived on the land and had parts of it in cultivation; and particularly, that some weeks before Birchett and Ormond's purchase he had applied to R. M. Crane (a witness for Birchett and Ormond) to borrow five hundred dollars to pay to Carpenter, saying then that he had paid about one hundred dollars towards the land, and if he could raise five hundred dollars more Carpenter would wait with him; and to induce Crane to make the loan, he offered to lease to him the land in dispute, and (252) to mortgage other land, worth twelve hundred dollars, and also this as a security, and did make a lease of part of the land to Crane; and also that on 18 August, 1829, he leased four acres to Riley Arrowood, to be worked for gold, on which the lessee proceeded to work, and the ore was found which Birchett and Ormond saw.
Thomas Dixon, a son of Robert Dixon, who was a party, stated that he heard Falls say, in the spring of 1829, that "he expected to give back the Carpenter land"; and also heard F. Carpenter, Jr., say that in the spring of 1829 "his father had sent him to Falls to see if he would pay or give up the land, and that he got no money," but he did not state that Falls agreed to relinquish the land.
Hugh Patterson stated that in the spring of 1829 F. Carpenter, Jr., brought a message to Falls, and witness saw them conversing, but did not hear the particulars, and that next morning Falls said that "he must go up in a few days and settle with Mr. Carpenter"; but whether he meant to settle for the corn or pay for the land the witness could not state. A few days afterwards Falls was very drunk, and was complaining of Dixon having gained an expensive lawsuit for land against his father, and said that he must give up the Carpenter land and try Dixon himself.
Jacob Starnes stated that several days before Birchett and Ormond purchased, Falls had made leases to Arrowood and others, and they proceeded immediately to work, and that those leases were publicly known; that on the day Birchett and Ormond purchased, Falls mentioned to the witness that "they had gone to purchase the land and gold mine in dispute."
John Hullett stated that in the fall of 1828, as he thought, though it might be in 1827, Falls delivered one load of corn to Carpenter, when the latter remarked, "You have come nearer paying the interest than I thought you had," and the balance of interest was then stated to be between five and ten dollars; Falls said it was less than he had expected, but that he should never be able to pay for the land, and that Carpenter *Page 203 
must sell it if he could, and pay himself; that no person was (253) present but the witness and Carpenter and Falls, and this was the only payment he knew of.
Two other witness proved that in October, 1828, F. Carpenter, Sr., offered to sell the land to Ormond, and said that Falls would not even pay the interest; and that in the spring of 1829 Carpenter again sent word to Ormond to come and buy the land, as he could get nothing from Falls; and F. Carpenter, the son, said that Falls would give up, and had told him to sell the land. Falls was not present at nor informed of either of those conversations.
To the discredit of John Hullett, many witnesses were examined who said that he was not credible; and other witnesses proved that the last payment was not made by Andrew Falls, the party, but by John Falls, who delivered four loads of corn in 1828, while Andrew was in South Carolina, and that the delivery of the corn by Andrew himself was in 1827.
Benjamin S. Johnson stated that a short time after the sale to Birchett and Ormond, Carpenter informed him that when they proposed to purchase, they stated to him that Falls had consented that they should, as they intended to establish a mill and store which would be convenient to him, residing on his own land, which adjoined; and that he, Carpenter, told them that he did not think it right to sell to any person after having agreed to convey to Falls; but that, upon receiving the assurance before mentioned, and believing Ormond to be a very honest man, he thought he might do so; and that he would not have conveyed to Birchett and Ormond if he had not believed it was approved by Falls.
Richard McKee, a nephew of Carpenter, stated that two or three weeks before Carpenter died, and when he was "fully at himself," he stated to the witness that he told Birchett and Ormond that he had sold to Falls, who held his bond, and that Ormond replied they had seen Falls, and he did not want the land, and had told them to go and purchase; that he, Carpenter, would still do nothing until Adderholt was sent for, who said, when he came, he thought the bond for (254) title was out of date; that, putting confidence in Ormond and thinking the bond void, he made them a deed; but that he soon learned from Falls that he had not given his consent to Birchett and Ormond, and therefore he received payment from him, and was willing to make the title to him.
Robert Dixon was, after his release and disclaimer, examined by Birchett and his associates under an order, subject to all just exceptions. He stated that those persons did not know that the gold found was on the Carpenter land, but they believed it extended to it; and that he told Carpenter before he signed the deed that he, the witness, *Page 204 
expected there was gold on the land as some had been found on the piece he had that day entered, on the branch just below. He also stated that in the winter before, at which time gold had not been found, Falls told him that he could not pay for the Carpenter land without selling a tract devised to him by his father, and that he would rather give it up than to sell his father's old place. In a few weeks afterwards Carpenter told him that Falls had given him up the land, to make his own out of it, and desired him to let Ormond know it, and request him to come up and buy. Upon being asked whether Falls did not tell him that he had actually given up the land, the witness replied that he did not, but only that he would have to do so.
There was also much testimony as to Falls' circumstances, in which the witnesses expressed opinions somewhat at variance. Upon the whole of it there was no doubt of his solvency. When he made the contract he had but little property, and was a young man living with his father, who was a farmer in easy circumstances; and Falls could himself get credit, from the general confidence in his honesty. He added somewhat to his property, and contracted debts; and in the early part of the year 1828 his father died and left him lands and a slave, worth about two thousand dollars, but somewhat encumbered; so that Falls' clear estate, after discharging his father's debts and his own (exclusive of the lands then in dispute and the price to be paid for them) was, in 1828 (255) and 1829, of the value probably of twelve or fifteen hundred dollars.
These cases were brought on and argued together at very great length by Badger for Falls and others; Thompson (of South Carolina), Devereux and Iredell for Birchett and others, and by Pearson and Winston for Carpenter's heirs.
These three causes have been properly brought on and argued together; for nearly the same questions arise in each, and all those that are important to the rights of the parties appear upon the pleadings in the original suit.
The cross-bill of Birchett and Ormond is chiefly for discovering from Falls as to matters set up by those plaintiffs in their answer as defendants to his bill. It charges only one new fact, or rather puts that fact more distinctly and in a stronger light than their answer did. That is, *Page 205 
that Falls was on the land with Birchett, and knew of his intention to purchase, and made no objection, but expressed his satisfaction. But the allegation is positively denied by Falls, and there is no evidence to sustain it. It would require very strong evidence to do so, for Birchett, within whose knowledge, as well as that of Falls, it must, if true, have been, does not venture to state it in that way in his answer, but only in general terms, that they inferred he had abandoned, because Carpenter had offered to sell the land for several months, and they (267) had not understood that Falls had forbidden him. The plaintiffs have examined but a single witness with a view to this point (Starns), and he says only that, on 22 August, Falls mentioned that those persons had gone to buy the land. But that does not tend to show his assent to the purchase, and is entirely consistent with his answer that he himself heard of their intention only on that day, and after they had gone. It reached him as a piece of common information, and in the same way he may have mentioned it. His conduct, immediately before and subsequent, renders the assertion of the bill incredible. All the other parts of this cause which can oppose the relief to Falls are involved in the original one, and may therefore be disposed of with that.
The cross-bill of Carpenter's heirs was probably filed principally to enable the plaintiffs therein to impeach the deed to Birchett and Ormond upon their alleged fraud, in case a decree should be refused to Falls in the original suit, and therefore Falls was made a party, that it might appear that his interest had been put out of the plaintiff's way. It brings forward no new matter against Falls; and if the matters charged, and admitted or proved, be insufficient to bar Falls from specific execution, still less will they authorize a decree that he shall give up the agreement. Equity may refuse to help either party, and leave both to law; but there is no ground in this Court to cancel a contract, fair in its origin, upon the score merely of default or abandonment. There cannot be a case of that sort, upon which that relief could be asked in equity, in which the facts, on which it was asked, would not defeat an action at law on the contract. As a bill of discovery simply, it has entirely failed with respect to Falls, who denies that he had either rescinded or abandoned the contract. The plaintiffs can have no relief, therefore, upon it, if Falls should be found entitled to a decree in his suit; for if Birchett and Ormond practiced the grossest fraud in obtaining the deed — although it may affect the costs — it becomes immaterial to these plaintiffs as soon as their interest in the subject (268) ceases and it is shown to belong, in the view of this Court, to the other party, Falls. It may be remarked, however, that the case is much stronger for Falls in the suit by the Carpenters than upon his own bill, because there is important evidence competent in the former *Page 206 
which he cannot read against Birchett and Ormond in his suit, which is the testimony of Johnston and McKee as to the declarations of Carpenter, the father, after he made the deeds. Falls had a right to use those declarations as against Carpenter, both to repel the imputation of abandonment on his part and the charge of surprise on Carpenter, which, the bill of his heirs says, ought to prevent the acceptance of the money by him from being considered as a confirmation. We think, indeed, that there is no ground for the allegation of surprise; for it is clear to our minds, from the testimony of those witnesses and that of Adderholt, and from many other concurring circumstances, that Carpenter never considered the contract abrogated or that he could honestly sell against the consent of Falls, and that he would not have sold without his consent or supposed consent. He may not have known, and probably did not know, what remedy a court of Equity would give on the contract; and may have thought that all Falls could have done at any time was to sue for the penalty, and that even that was then out of his power. But he had no idea that he had let Falls off, or that Falls wished to be off. He constantly meant to convey to Falls if he could pay the money. He probably believed that Falls would not, after all his indulgence, stand in the way of a sale to another if it became necessary for Carpenter to have money and Falls could not raise it. But that was all. He had in his own mind gone no further, if even that far. That was the reason why he spoke of "the bond being dead," and at the same time inquired whether Falls was willing to give it up. Whether Falls could sue him, or not, he had always a regard to the interest and wishes of Falls; and however deficient his knowledge of artificial equity, or whatever the grade of his intellectual capacity at the time may have been, he seems to have retained to the last that best kind of sense, (269) which prompted him to be an honest man and observe his contracts in good faith, according to their substantial meaning, as understood by the parties. As against his heirs, therefore, the inference from these facts is strong that the contract was considered by the parties to be a subsisting one, and it is rendered conclusive by the subsequent declarations, which are express to that purpose. That Carpenter was deficient in understanding to make a contract or transact ordinary business there is no evidence that will bear stating; much less that he was incompetent to acts proper to the performance of a previous fair contract. The argument that he was ignorant that the contract was not binding, and therefore his acts and declarations, under the belief that it was binding, ought not to be deemed a confirmation, is altogether fallacious. It is founded upon the cases of conveyances obtained by trustees, tutors or guardians. They are voidable and cannot be confirmed by a second deed unless the first deed was known to be not binding, and *Page 207 
the second was intended simply to make it so. The meaning is, that the last shall not cure the vice of the first, unless it was intended to have that very effect, which cannot be, if the maker thought himself obliged by the one to make the other. But that has no application to the case of a contract which has no vice, but was fair, in respect of which the only question is whether it continued to be a contract between the parties. Acts done under it establishes its subsistence. They do not constitute a case of confirmation, but of performance. There could not be a doubt, therefore, that in the actual state of the case as against Carpenter the plaintiff, Falls, would be entitled to specific performance if the legal title were now in his heirs. Their cross-bill must consequently be dismissed as against Falls and those claiming under him, and with costs. That brings us to the inquiry, what relief he is entitled to as against Birchett and Ormond in the original suit.
That question was made in the argument to depend mainly upon the right of Falls to have called for a deed from Carpenter, upon the facts existing before, and on 22 August, 1829, as those facts (270) appear upon the proofs, exclusive of the subsequent declarations and acceptance of the purchase money by Carpenter. Birchett and Ormond are purchasers who have not paid any money, and consequently stand in Carpenter's shoes in respect to the equity of Falls, but that equity must be established against them by evidence that is competent against them. The Court will consider the case in that light, and throw out of view the testimony of Johnston and McKee and the payment of the balance of the price.
The deposition of Robert Dixon must, for a like reason, be rejected upon this part of the case. Having released to his companions before Carpenter filed his bill, he was not made a party defendant to it, and his deposition was therefore competent for Birchett and Ormond against Carpenter. But it cannot be read against Falls, as to whom the release pendente lite is a nullity, and who must have a decree against the witness, if he gets one at all. Indeed, his liability for the costs, although in discretion, would be a sufficient objection, according to Barrett v. Gore, 3 Atk., 401. That case has been questioned in some of the courts of this country. Nevertheless, we approve of it, because it is a safe rule that a witness should be entirely disinterested, and in a case of this kind the Court must, upon its settled principles, decree costs against Dixon, if any decree be made against him.
In the point of view in which the case is now to be regarded, the offers of Carpenter to sell to others, and the declarations of him and his son that Falls had agreed that he might do so, must also be put aside, because the knowledge of those circumstances is not brought home to the plaintiff. *Page 208 
It may be remarked here, however, that upon one ground Falls might be found upon investigation to have a substantive equity against those purchasers distinct from that he might have had against their common vendor. Supposing that the contract had not been expressly rescinded, but that Carpenter thought that it had been abandoned by Falls, and, under that impression, sold to another, who contributed to produce (271) or confirm that impression, and represented that Falls had abandoned expressly in favor of the person seeking the second purchase — it would seem to constitute a case of deliberate deception by active means for the sake of gain, which ought to deprive the purchaser of all the advantage of his deed, and make it subservient to the interest of the party, whose conduct and wishes had been misunderstood by him who made the deed, and misrepresented by him who took it. In this aspect of the case, Carpenter's own interest is to be considered as gone, at all events, either upon his contract with Falls or his deed to the others; and the question is, to which of them ought it to go? Carpenter honestly disabled himself from conveying to Falls. He knew he had made default, and from that he may possibly have inferred that the contract was abandoned by Falls. He was ignorant that, in fact, it was not abandoned. But Birchett and Ormond knew, and fully knew, better. Their answer, indeed, states that Carpenter told them that the bond was void, and that Falls had abandoned — intending to imply a negative pregnant to the proposition that such remark fell from them. But they do not say that affirmatively, and, the answer being silent as to that charge of the bill, the unequivocal testimony of the witness (Adderholt) proves it; and also that Carpenter deemed it a most material circumstance that Falls was willing the other should buy. Admit that Carpenter might have insisted on the default as a forfeiture, yet, if he did not, and would then have conveyed to Falls, upon the footing of their former contract, in preference to conveying to Birchett and Ormond upon a new contract, against the wishes of Falls, ought not the last bargain — the price being the same in each — to be looked upon as having been made, substantially, in compliance with the first contract, as it was, expressly, upon the supposed wishes of the party to that contract? Carpenter is put out of the way because he would not rely on Falls' default against him. Are the others in a posture to raise the objection simply because he might have done it, though he did not? Notice subjects them to all the equities against Carpenter, but their conduct may prevent them from being entitled to all his defenses against Falls. Now, (272) whether Carpenter told them that the contract with Falls was not binding, or they told him so, it is certain that Carpenter would not have made them a deed, as the contract had not been actually canceled, if he had not believed that Falls fully assented to it. This *Page 209 
they knew perfectly was not a fact, though they represented it to be the fact. They assign certain reasons why the opinion they attribute to Carpenter — that "the bond was void" and that Falls had abandoned — might have been deemed correct by them. But they could not deny a knowledge of other facts, notorious to them, that proved conclusively that he had not in truth abandoned, though his claim might not have been valid in law. They knew that he was in possession; that he was cultivating a part of the land; that he had discovered gold and was engaged in collecting it; that he had given leases to others for the same purpose; and, above all, that he had refused a lease for a part to the very person who pretended that Falls was willing that he might take an absolute conveyance for the whole. They knew that he was not only able but in a very short time would be ready to pay the purchase-money, and that if he did, Carpenter felt himself bound (whether he was or not in law) to make the deed to Falls. Yet they hold out that he could not pay and did not wish to have the land, studiously producing or confirming that belief. They got, then, the title from the person in whom it was vested, because that person was governed by the wishes of Falls, as having a prior claim — a claim which he was willing might be renounced, but also ready to recognize as the right, if asserted. It would have been as beneficial to the claimant, and it was as effectually used by the other parties as the most perfect right could have been. After pretending to be substituted to it, and thereby gaining the legal title, can they supersede the thus acknowledged right by the objection that it was not legally valid? It should rather seem that whatever it was before, it was thereby made valid as against them. But as little was said in the argument upon this view of the subject, the Court has considered the case upon the points on which the counsel placed it, and on which it will be decided.
The first objection on the part of the defendants would be (273) fatal if founded in fact. It is that the contract was expressly rescinded by a subsequent parol agreement. But to this allegation there is no evidence, while it requires that which is clear, positive, and above suspicion. Hullett's testimony comes the nearest to it. He states a proposition by Falls, but no assent on the part of Carpenter. Besides the witness is mistaken as to the time, for more than a year after the one load of corn, which Hullett saw Andrew Falls deliver, four other loads were delivered for him (1828) by John Falls. The parties, therefore, acted on the contract after the time Hullett speaks of, which proves that it was not then rescinded. As late as the spring of 1829, Carpenter sent for further payments, and the defendants have themselves examined witness who can go no further towards establishing even abandonment than to state Falls' declarations about this last period, that "he would *Page 210 
have to give up the land" or that he "must give it up because he could not pay for it." The Court must therefore declare that the contract was not rescinded by agreement between the parties, and that it was not expressly renounced or abandoned by the plaintiff Falls. Those declarations are only indicative of his fears as to what necessity or convenience might require him to do, and not of a past or immediate refusal to proceed on the contract, for he still continued to act as owner and to strive to raise the purchase-money by a mortgage of his other property. He is therefore entitled to the common decree unless other reasons render it unfit that he should have it.
The substance of the objections consists in the failure of Falls to pay the purchase-money punctually, and in his insolvency, which rendered him unable to perform his agreement until the land rose in value, and then only out of the land itself, and in the great increase of value immediately before he offered to comply. The argument for the defendants did not distinctly proceed upon those grounds severally, as if any single one of them constituted a bar to the relief, though the principal proposition taken was the general one, that time is material in equity, and is deemed of the essence of the contract, and therefore the relief (274) must be refused; and the other circumstances were invoked to sustain that doctrine by showing its reasonableness in its application to this cause. It struck us that it required the whole to make the argument plausible, and that if any one of the positions be false in fact or immaterial to the conclusion the whole proposition must fall.
The allegation of insolvency is unfounded. There was no change in the circumstances of the plaintiff except for the better, and he was fully able to pay the debt. Had he been insolvent, it would be a question how far one who contracts with a person known by him to be in that situation could, after an increase in the value of the estate, allege, for the first time,that as a reason for annulling the contract, or why a court of equity should not give full effect to it. It might form a proper motive for inserting in the contract a clause that default should avoid it, and be a reason with the Court for holding in such case that the provision was not formal but substantial. But when the vendor retains the title as a security, and also takes bonds of the vendees as a separate and absolute obligation, binding on the person, and recoverable without showing performance on the part of the vendor, and likewise deals with an insolvent person as if he were solvent, by leaving him in the articles at large as to time, it is not seen how the court can put a construction on the instrument, founded on the circumstance of insolvency, as indicative of the intention of the parties. Insolvency, whether existing at the time of the contract or occurring subsequently, if continuing, so as to disable the purchaser from fulfilling his contract, may authorize the *Page 211 
other party, after request and default, to renounce the contract, and after reasonable notice may discharge him, or it may be evidence with other things of abandonment by the purchaser. But in that case it may also be repelled by other evidence that there was no abandonment in fact. Insolvency by itself does not dissolve the agreement, nor put it in the power of either party to treat it as dissoluble at his will merely. But it is useless to speculate upon the consequences of that circumstance, if it existed; it is not the fact, and therefore cannot (275) be brought to bear on the argument.
It is otherwise with respect to the increase in the value of the land, which, at any rate, will bring a great deal more in the market than the contract price. It might be well, however, to ask, who now urges this fact, and whether that party can avail himself of it? Carpenter's interest in the subject in litigation is excluded, as already stated; and the decree, as one for specific performance, if made, must be against Birchett and Ormond, who have the legal title. They are alone interested, and they bought after they knew of the increased value; Falls, before it was discovered. It is not a case of turpitude, in which equity will not interfere, but leaves the possessor to his advantage, because the other has no merit on which it can be taken away; it is simply an objection that equity ought not to transfer so valuable an estate for so little money. Does that lie in their mouth, when they were to give precisely the same sum, and had notice of the other's purchase? But not to speak of that, it is certain that the increase of value is not such a change in the subject-matter of a contract as is, of itself, a ground for rescinding or not enforcing articles. The thing contracted for is, in equity, considered the purchaser's from the time of the contract, and stands as a security only to the seller. Ordinarily, therefore, advantages or disadvantages, arising subsequently, either from unforeseen accidents or from contingencies, on which the value was known at the time to be dependent, cannot be a cause for refusing to enforce an executory agreement more than for annulling an executed conveyance. Paine v. Meller, 6 Ves., 352; Pritchard v. Ovey, 1 Jac. Walk., 403; Revel v. Hussey, 2 B. Beat., 287. What happens to the property while the contract is in full force cannot alter the respective rights. If one of the parties refuse to perform, and there comes a change of circumstances, upon the strength of which he is desirous to go on with the bargain, and insists on it, he may properly be repelled, although he was not watching for that change, because a favorable chance ought not to profit him who would not run the risk of an unfavorable one. In like manner, if a loss arises by a fall in value of things of fluctuating price (276) and subjects of traffic, and the vendor could not or would not make a title, according to his contract, in which case the purchaser *Page 212 
might have avoided the loss, the former, having caused the loss, ought to bear it, and cannot compel the other to take the property. This brings us to the consideration of the grounds of decreeing specific performance, and of what is deemed a fault of the party, which shall defeat this relief.
It has been contended that the nonpayment of the purchase-money at the day or, at any rate, that circumstance, with any other slight one of inconvenience or loss to the seller, is a sufficient reason for refusing it, and that here, the delay and the change in value discharge the vendor. The jurisdiction was traced to its origin, and it was said that its principle was to execute specifically a contract legally valid, and therefore that time must be essential in equity, because it is at law; and many cases were cited and minutely criticized. Certainly the cases show that, under a great variety of circumstances, the court has refused the relief when the party applying was in default in respect to the thing to be done by him, or in respect to the time in which the thing was to be done, and circumstances had then so changed that performance by him would not put the other party in the same situation as if it had been done in due time. On the other hand, the cases are as numerous in which the relief has been given, where there was default in those respects, and a change in the title or value of the property, upon the ground of the conduct of the parties, before or after the alleged default occurred. We do not think it necessary to examine all the cases, nor to dwell much on the elementary principle, for we think the facts of this case are such that the decree we feel obliged to make will not be in conflict with a principle established or a precedent furnished by any one of the cases in the books.
What the Court deems the material circumstances of the case may be, in a great degree, gathered from what has been already said. But it may be well to group them together. The plaintiff agreed to give seven hundred and fifty dollars for the land, and executed two (277) bonds for the price, payable, with interest, at one and two years, the last of which fell due in November, 1828, and took a bond from his vendor to convey "at the payment of the purchase-money." He went into immediate possession or, rather, continued that derived under a former contract, and acted in all respects as owner, without any objection on the part of the vendor, up to the moment of the sale made by him to the other defendants, which occurred between nine and ten months after the last payment fell due. In the meantime he repeatedly made payments, altogether to the amount of two hundred and forty dollars, of which he agreed that a part should be applied to another debt, and about the sum of one hundred and forty dollars, including interest, remained applicable to the debt for the land; and also, in the *Page 213 
meantime, he discovered a gold mine on the land, of parts of which he gave leases, and was exerting himself to raise money to discharge the balance on his bonds. The vendor did not wish him to give up, but wished him to complete the purchase. He had never renounced the contract, but had expressed, not to the vendor but to others, the fear that he would have to do so as he did not expect he could make the payments as soon as they might be wanting. We think these facts constitute the case of a contract partly performed and in the course of execution, and continuing, clearly, by the consent of both parties. And we are of opinion that relief could not be denied in such a case even if there has been a default, after it has been thus acquiesced in. There is no case to give countenance to a decree for the defendants.
It is not denied that time is material in equity. It is always respected here. Nor is it denied that time may be of the essence of a contract. Exact punctuality may be of great importance to the interests of a contracting party in many situations. In some, it is obvious from the state of the property and other circumstances. In others, we do not doubt that the instrument may be so framed as to show what is true, namely, that it is a substantial part of the contract. In those cases a court can no more dispense with that than any other vital provision. But the parties themselves can dispense with it, and the inquiry, where it has once existed, is whether they have dispensed (278) with it. It is in that sense true that time is not essential, but immaterial in equity, when comparing its effects here with that at law. It never was, and cannot be regarded in both courts in the same light. It is true, a maxim is found that equity does not decree performance of an agreement, upon which an action would not lie at law for damages, and anciently it was the usage to send the party to law. But that was to determine whether the agreement was so constituted as to have become binding at any time, whether it ever was a legal contract, and not whether the party had lost his legal remedy by accident or the nonobservance of a provision, deemed in equity merely formal. But the jurisdiction is established now, upon the view of the court of Equity, as to what forms a sufficient contract, and it is beyond a doubt that some are so considered which could not be stated to a court of law, as, for example, the cases of parol contracts with part performance, under the statutes of fraud. And in respect to time, so far from equity being governed by it as a conclusive bar, it was one of the earliest jurisdictions to relieve against it, as in the case of penalties. Suppose a day to be fixed for Carpenter to make a deed and that he made after the day, at law the penalty of his bond might be recovered. Ought equity to allow that? Certainly not, and would not. It could not be tolerated, that with the deed in his pocket Falls should say, "I stand upon the *Page 214 
bond, and that every provision in it, time included, is of the essence." If he could not say that, how can the other party? Time, with the conduct of the parties, is material here, while the conduct of the parties is nothing at law. The law is necessarily confined to the time specified in the deed, because the declaration is on the deed in his verbis, not to be varied by another agreement or mode filed by acts en pais. But here the contract is for the thing which thereby becomes the property, and at the risk of him who contracts to get or take it, and the other party ought not to insist on its forfeiture for a slip, but only on compensation for the loss thereby arising to him. Interest on the purchase-money (279) generally places him in as good a situation as if there had been no default. It is therefore the general doctrine in equity that time is not of the essence of the contract. In cases in which it is seen really to be essential, that is, where it must have been understood by the parties at the time of the contract that events would probably happen, in which interest would not be a compensation, because the title to the property or its value might be greatly affected by those events, and one of them holds back until the contemplated contingency happens, that person cannot apply to enforce the contract which he has violated, and violated in bad faith, and as to a main ingredient of the bargain. Upon this principle rests the cases upon sales of reversions, stock, and other uncertain interests or titles. To decree a specific performance in those cases to the defaulter would be to make a wager binding in favor of him who refused to put up his stake, because if he had put it up the event proves he would have won.
Default in respect of the time is not therefore a bar of itself, except in peculiar cases, but is only evidence, with other things, of abandonment, and of course may be rebutted. It may in all cases be made essential, but where it is, it does not follow that it is necessarily conclusive in equity as it is at law. It cannot be made thus conclusive here, that is to say, so as to preclude a party from showing that it ceased to be essential, as is the case at law from the form of pleading and the mode of proof. But it is never to be forgotten that in equity a party may waive, and it may be shown that he did waive, a stipulation introduced into a contract for his benefit, whatever may be the subject or the terms of the stipulation. It was said, indeed, by the counsel for the plaintiff that both parties must be active, and that, even if articles expressly state that the agreement shall not be binding unless performed at the time, a party cannot avail himself of it unless, before the first default, he give notice that he will take advantage of it. That would be going very far towards saying that time could not be made essential, for, if the contract be not notice enough to the parties, it would be difficult for the Court to perceive upon the same instrument that it was essential. *Page 215 
But a failure to avail himself of it at the first fit occasion, (280) and before or when the other begins after default to act again on the agreement, may produce a very different result. He gives up thereby that part of the contract as much as the other, by his default, if insisted on, relinquishes the other parts of it. Thus far we think it correct to say that both parties must be active. A small matter may amount to such waiver — anything that draws on the other party to execute the agreement afterwards or that shows it is deemed a subsisting agreement after the essential default. In Seton v. Slade, 7 Ves., 264, the purchaser's taking the abstract, although not bound to do so, and stating objections to the title, overruled his defense. In Hudson v.Bartram, 3 Mad. Rep., 440, Lord Eldon admitted the time to be of the essence of that contract, and it was expressed. Yet he held the vendor to be bound, because, when the vendee excused his default by letter, he did not reply to it, and afterwards referred a person entitled to a charge on the premises to the vendee, and avoided the vendee when he subsequently sought him according to the engagements of his letter. The vendee could not assert the inconsistent rights of owner and vendor at the same time, and therefore the purchaser had a decree. If the party has been guilty of any unfairness, or his delay was with the view to test the value of the bargain before he acted on it, or there is satisfactory evidence, from circumstances, that he once abandoned, or he has wholly failed to perform any part, and a loss has thereby ensued to the other party, in those cases the justice and the law are both manifestly against him that is in fault. Of one or the other of those descriptions are all the strongest cases cited for the defendants. In Lloyd v. Collet, 4 Bro. C. C., 469, the vendor wilfully delayed to furnish the abstract, though repeatedly requested, for six months after the vendee had sued for his deposit, and the subject was one of fluctuating price and an object of speculation, and had fallen. In that case it was said that a party's own neglect was a singular head of equity. Certainly it would be, where, as in that case, nothing had been done. Hence, LordLoughborough (4 Ves., 690, note) asks the plaintiff for a case to (281) prove that, where nothing had been done, the time was not essential. But nothing done on one side, and advantage properly and in due time taken of that on the other, is very different from part performance, without any attempt to put an end to the contract by the other party, by notice of any sort. To make that case in point here, "not everything" and "nothing" must have one meaning. In Brashier v. Gratz, 6 Wheat., 528, the purchaser had done nothing. He could not take possession, for the property was in litigation, which he was to manage, and for which he had received compensation. He was to have a special warranty, and in case the land should be lost, half the price was to be returned to him. *Page 216 
He became insolvent subsequently, and failed to pay any part of the price, and likewise failed to attend to the suit at all, and at the same time refused the vendor's offer to rescind. The vendor was then obliged to prosecute the suit, or lose the whole price. When gained, the land rose suddenly, and Brashier raised his purchase money on the credit of it, and claimed a conveyance. A decisive objection was that he bought the title as a doubtful one, but would not take it as such, nor as long as the price he agreed to give was fairly the value, but claimed it when the title ceased to be doubtful and the value increased greatly. It was a case, within the principles of those of reversions, where nothing has been done until the life falls in. In Allye v. Deschamps, 13 Ves., 224, there was a sudden, unforeseen rise, but that did not govern the judgment; it only proved the dishonesty of the plaintiff's motives. LordErskine plainly went on the abandonment of the assignees. The purchaser took possession and became bankrupt, after paying a less sum than the rent during the time he occupied. Bankruptcy is stronger than insolvency, because it is an absolute discharge, and it was once supposed to dissolve the contract, though it is now held otherwise. Brooke v.Hewitt, 3 Ves., 255. But, although the assignees might have claimed the benefit of the contract, they did not. They never entered into possession, and therefore were not liable for the purchase money, unless the vendor chose to come in under the commissions, which they (282) knew, of course, that he would not do. As soon as the value rose, and the assignees could certainly pay the purchase money out of the estate on which it was a lien, they wished to make themselves liable for it and take the estate. No, said the chancellor; you must not "lie bywith a view to see whether the contract will prove a gaining or losing bargain, and, according to the event, either to abandon or, considering the lapse of time as nothing, to claim a specific performance." The decision is nothing more than that a party cannot elect to abandon, or not, as it may appear hereafter to be his interest. He must decide at the proper time, and the decision, once made, is conclusive. The bankruptcy alone did not discharge the contract, nor was the relief refused because the value had increased. But it was because the whole price remained unpaid, and nothing
had been done after the bankruptcy, which was an abandonment.
The present is not like the case Hatch v. Cobb, 4 John's C. C., 559, which was much pressed at the bar. There was no acquiescence, but express notice that the vendor must sell again, and the purchaser had covered all his property by a recent judgment, and there was no separate security. All the vendor could do was to get his land again, and he gave the other the opportunity of paying for it and keeping it. But this question could not arise in that case, because the second purchaser was *Page 217 
not a party to the suit, and the bill could not, at any rate, lie for damages alone. In Benedict v. Lynch, 1 Johns. C. C., 371, the purchaser was let into possession, it is true. But the contract for purchase was expressly rescinded and a new one made for a lease for one year, under which the plaintiff enjoyed the term, and, moreover, he told the second purchaser, who inquired with a view to making a contract, that he held only for the year and had given up his purchase. In Harrington v.Wheeler, 4 Ves., 686, the sale was of a reversion, and the vendee did not take possession nor do anything until he filed his bill, six years after the contract and one year after the death of the tenant for life. This case is taken notice of in Alley v. Deschamps as one in which money was paid, but it hardly deserves that character. The vendee (283) advanced £ 104 at the contract, but he took a mortgage on the estate for that and, just before suit, demanded it as a debt from the second purchaser. Besides, the object of the sale was to pay off a heavy mortgage which the plaintiff agreed to discharge; and the second purchaser, who was originally joint owner with the plaintiff's vendor, was, to save his own share from being foreclosed, compelled to buy the other shares and discharge the mortgage himself. That case was, therefore, one both of bad faith and of unequivocal abandonment.
The present case, on the contrary, stands on the common equity of a contract for an estate in possession. The purchaser is in arrear for a large part of the purchase money for nine months, but is fully able to pay it, and the vendor acquiesces in the default during the whole time; and then, without any notice whatever, makes a second sale to a person, with full notice, not only had before, but repeated to him at the time by the vendor himself. Having allowed it to subsist after the default, he cannot put an end to it by an act which, supposing it to subsist, is in violation of it; but to that end there must be a previous, formal and reasonable notice that if the purchaser does not fulfill it, the other party will not hold himself bound. This would be the law if the purchase money was only secured by the articles, and the time specifically made essential therein. It is much clearer when the vendor holds the bonds of the other party and does not offer to surrender them. Upon this agreement the time also seems to be as much at large as it could be, unless it had expressed that it should not be material, and left the money to be paid during the purchaser's lifetime, unless hastened by request.
An objection was made to the assignment by Falls, upon the ground of maintenance or champerty. But a cestui que trust may surely assign when he or his trustee is in possession, which has been the case at every moment since his purchase. He has never been out of possession, and contracted on the land. The occupation of a small part by the *Page 218 
(284) others, for a short time, cannot affect his conveyances, even if that could be regarded as tortious as against him, upon the ground that they are only constructively trustees.
We think, therefore, that the plaintiffs in the original bill are entitled to the usual decree for specific performance, and to be quieted in the possession by injunction; and that Birchett and Ormond, and those defendants who claim under them, must pay the costs, and that the cross-bill of Birchett and Ormond must be dismissed, with costs. Those decrees extinguish all claim of the Carpenters to the land, and consequently their cross-bill must also stand dismissed as against Birchett and Ormond, and without the necessity of determining the question of fraud from their imputed concealment or representations touching the discovery of gold, but without costs to those defendants.
PER CURIAM. Decree accordingly.
Cited: Barnes v. Strong, 54 N.C. 107; Scarlet v. Hunter, 56 N.C. 86;Taylor v. Kelly, ib., 244; White v. Butcher, 59 N.C. 233; Allen v.Pearce, ib., 311; Reynolds v. McKenzie, 62 N.C. 56; Faw v. Whittington,72 N.C. 323; Herren v. Rich, 95 N.C. 503; Holden v. Purefoy, 108 N.C. 167,170; Boone v. Drake, 109 N.C. 82; Taylor v. Taylor, 112 N.C. 31;Gorrell v. Alspaugh, 120 N.C. 368.